## The People *vs.* Haynes.

Where a purchase of merchandise is made, the goods selected, put in a box and the name of the purchaser and his place of residence marked thereon, and the box containing the goods sent by the vendor and put on board a steam-boat designated by the purchaser, to be forwarded to his residence, the *sale is complete,* and the goods become *the property of the purchaser.*

And where, *after such delivery,* the vendor, on receiving information inducing him to suspect the *solvency* of the purchaser, expressed an intention to *reclaim* the goods, and the purchaser thereupon made *representations* in respect to his ability to pay, by means of which the vendor abandoned his intention; and the purchaser was then indicted, charged with the offence of having *obtained the goods by false pretences,* the *representations* made by him being alleged as *false pretences:* IT WAS HELD, that the sale being complete before the *representations* were made, the defendant could not be considered guilty of the crime charged against him.*

ERROR from the supreme court. Charles Haynes was indicted at the *general sessions* of the city of New-York, under the statute, for *obtaining goods by false pretences* from Messrs. Coch-

---

* The above are the only points adjudged in the decision of this case; the court declining to pass upon the other questions presented by the bill of ex-

ran, Addoms & Co. a mercantile firm in the city of New-York, on the 9th November, 1833. The representations alleged to have been made by him, by means whereof he obtained the goods, were, 1. That he had then no note protested for non-

ceptions. Those questions are, 1. Whether, admitting the representations made by the defendant to have been made previous to the completion of the sale, and that thereby the vendors were induced to give him credit, such representations can properly be considered *false pretences within the meaning of the statute;* and 2. Whether when, as in this case, *several pretences* are alleged to have been made, and are averred to be false, the public prosecutor is bound to prove *all* the pretences to be false, or whether it is sufficient to prove less than all to be false, provided that enough be proved to authorize the jury to say that those proved had so material an effect in procuring the credit or in inducing the delivery of the property, that without the influence of such pretences upon the mind of the party defrauded, he would not have given the credit or parted with the property. These questions being of an interesting character, and having been fully discussed by the CHANCELLOR and *Senator* TRACY, the conclusions at which they severally arrived are here presented.

*Conclusions arrived at by the* CHANCELLOR *in the Opinion delivered by him:*

A bill of exceptions cannot be presented in a *criminal case,* to review the charge of the court or the finding of the jury upon *mere matters of fact,* where there has been no erroneous decision upon *matters of law.*

Whether it is competent for a court to grant a new trial in a case of *felony,* at the instance of the defendant, where there has been a palpable misdirection of the court upon mere matters of fact, or a verdict clearly against the weight of evidence without such misdirection, where no erroneous decision in point of law is made, *quere.*

It is not necessary to constitute the offence of *obtaining goods by false pretences* that the owner should have been induced to part with his property *solely and entirely by pretences which were false.* If the jury are satisfied that the pretences proved to have been false and fraudulent were a *part of the moving causes* inducing the owner to part with his property, and that the defendant would not have obtained the goods, had not the false pretences been superadded to statements which may have been true, or to other circumstances having a *partial influence* upon the mind of the owner, they will be justified in finding the defendant guilty of the offence charged, within the letter as well as within the spirit of the act.

In the present case, although *all* the pretences stated in the indictment as those upon the strength of which the goods were obtained, are charged to be false; still if *either* of them was in fact false, was intended to deceive the owners of the goods, and induce them to part with their property, and produced that effect, the indictment was sustained: *one* false pretence is sufficient to constitute the crime, although *other* false pretences are charged.

To constitute the offence of obtaining goods by false pretences, it is not necessary that any *false token* should be used, or that the false pretences should

payment ; 2. That he was then solvent, and worth from nine to ten thousand dollars ; 3. That he was perfectly easy in his money concerns ; 4. That he had no endorsers ; and 5. That he had never endorsed more than one note.   Each of these

---

be such as that *ordinary care* and *common prudence* were not sufficient to guard against the deception.

The offence consists in *intentionally* and *fraudulently* inducing the owner to part with his goods or other things of value, either by a *wilful falsehood*, or by the offender's *assuming a character* he does not sustain, or by *representing himself* to be in a situation which he knows he does not occupy.

As to the ownership of the goods at the time of the making of the representations, the chancellor was of opinion that the delivery of the property on board the steam-boat, for the purposes for which it was delivered, *divested* the vendors not only of the *possession*, but of the *title* to the goods.   That they however had the right of stoppage *in transitu* in case of the *insolvency* of the purchaser; but that to re-invest themselves with the right of property and possession of the goods, they were bound to take corporeal possession of them, or to give notice to the carrier not to deliver them to the purchaser, or to do some other equivalent act.   Not having done so, the property in the goods was in the defendant, and consequently he *did not obtain the possession or delivery of them by means of the false pretences* stated in the indictment ; and although he probably by his false representations prevented the vendors from exercising the right of stoppage *in transitu*, still he could not be convicted of the charge of *obtaining the goods* by false pretences—for which reason, and that alone, he was of opinion that the judgment of the supreme court *ought* to be *reversed.*

*Conclusions arrived at by Senator* TRACY *in the Opinion delivered by him :*

The delivery on board the steam-boat, under the circumstances of the case, was an *absolute* delivery, and vested in the purchaser not only the possession but the title to the goods; and even if the vendors had the right of stoppage *in transitu*, in case of the insolvency of the purchaser, the existence of that right did not render the delivery *conditional*, nor could the exercise of it divest the purchaser of his ownership of the goods.   The *representations* relied on as false pretences being *subsequent* to such delivery, if they could be considered as *false pretences*, would not therefore subject the defendant to the charge of *obtaining the goods* by false pretences.

Where there are several pretences alleged in the indictment to be false, *all must be proved to be false.*   The offence consists of two distinct elements, to wit, *false pretences* and *obtaining the goods of another.*   All the pretences together constitute but one portion of the offence ; and every pretence, therefore, set forth and alleged to be false, is a substantive part or *constituent element* of the offence, and cannot be deemed immaterial ; the *petit jury* can convict only upon the pretences found by the *grand jury*, as it cannot be known that they would have found the bill true, unless it had been proved

pretences were *negatived* in the indictment. On the trial, Addoms, one of the firm, testified that he had known Haynes about 18 months, and had sold him goods at three different times previous to the 9th of November, 1833, upon a credit of about four months at each time, the sales together amounting to about $1500; that the last credit, of about $800, fell due about three weeks before the 9th of November, and was punctually paid; and that the credit of Haynes with his firm was very good. On the 9th of November, Haynes selected the goods set forth in the indictment, which were packed in a box, and the box marked on the outside and addressed to "Charles Haynes, Boston," being the place of his residence, and by Haynes' direction were sent to the steam-boat for Providence, and a receipt therefor taken by the cartman, who delivered the receipt to Mr. Addoms. The mate of the steamboat testified that when the boat arrives at Providence they immediately deliver the goods to a Boston waggoner, who takes them to Boston and there distributes them according to the marks and addresses; they do not require the receipt or bill of lading to be surrendered before the delivery of the goods; they are delivered without asking for or requiring the receipt. Addoms further testified, that after the goods were sent on board of the steamboat, and on the same day, he learnt that Haynes had had a note protested, and determined to send the receipt to the steamboat and get the goods back. Before doing so, however, Haynes came into the store of the firm, and Addoms told him that they could not deliver the goods, as they had heard that he had had a note protested. Haynes denied that a note of his had been protested, and in answer to inquiries of

ALBANY,
Dec. 1835.

The People
v.
Haynes.

---

before them that *all* the pretences found to have been made, had in fact been made and falsely made.

The words *other false pretence* in the statute, considered in connection with the other terms used, and the circumstances under which the statute 30 *Geo.* 2 was passed, upon which ours is founded, mean not a *bare naked lie*, unaccompanied with any *artful contrivance* fitted to deceive, although intentionally and fraudulently told, with the purpose of obtaining the property of another; but they mean an *artfully contrived story* which would naturally have effect upon the mind of the person addressed, equivalent to a *false token* or *false writing*,—an ingenious contrivance—an unusual artifice, against which common sagacity and the exercise of ordinary caution is not a sufficient guard.

Addoms, said that he was worth from nine to ten thousand dollars; that he was not embarrassed, and was able to pay all that he owed; that he had no endorser and that he never had endorsed but one note in his lifetime, and that was more than a year ago. Addoms then observed, that if these representations were true, and Haynes would on his return immediately send him a statement of his affairs, he would deliver the goods, and accordingly handed to him the receipt and the invoice, and took his note at thirty days for $657,10. Addoms stated that he would not have delivered the receipt, and would have taken the goods out of the steamboat, but for the representations made by Haynes. He heard of Haynes' failure about the *sixth* of *December*, and the goods remained unpaid for. On his cross-examination, on being asked if a stranger had offered to purchase goods after he had heard that such stranger had had a note protested, would he have trusted him upon his making similar representations to those made by Haynes, answered that he would not; that from his previous dealings with Haynes he thought well of him, and did not believe him capable of cheating him as he had done. In *December*, Haynes, in answer to an observation of a creditor that he must have *known himself insolvent* when he came to New-York to make his purchases, said that if he did know it, he was not bound to tell it; and admitted that he had been insolvent for one or two years, but that for the last year he had been growing much worse. To this creditor Haynes offered, as collateral security for the debt he owed to him, a note made by himself and endorsed by his brother, which offer was accepted. Haynes also told him that his brother had taken out an attachment against his property, which would realize him about $11,000, and he had also assigned to him property which would give him altogether, about $16,000. To the officer who brought him from Boston, he said he owed between $70,000 and $80,000, and was insolvent about two years before he bought the goods in question; that his brother had accepted for him to the amount of $25,000, and it was not right to see him suffer. To another witness he said, that he was worse off than he had thought for; that he knew he

was behind-hand, but that he was not bound to tell the truth; if he had been, he could not have got the goods. To another of his creditors he offered a compromise of 20 or 25 per cent., but observed that if the offer was accepted, he would not be able to pay it, and he therefore hoped it would not be accepted. The counsel for the prisoner insisted, before the court and jury, that there had been no artifice or circumvention used by prisoner, and that the representations were such as might have been guarded against by the exercise of ordinary prudence; that the false representations were not the *sole inducement* to the credit; that credit had been given to *all* the pretences mentioned in the indictment, all of which were averred to be false, whereas a great part thereof were true; that the delivery of the goods on board of the boat, after the same had been separated, boxed up and addressed to the defendant, was a complete delivery, and that no pretences alleged to be false were made after such delivery; and that even if the pretences had prevented Cochran, Addoms & Co. from claiming a re-delivery of the goods, the indictment did not cover that ground, and therefore could not be supported; wherefore they claimed an acquittal, and asked the court to charge the jury upon the points above stated. The recorder charged the jury, that as to the first false pretence charged in the indictment, there was some evidence that a note had laid over; that the fifth was not proved, but that the second, third and fourth were proved to be false; that the questions for the jury to determine were, 1. Did the prisoner obtain the property from Cochran, Addoms & Co. as charged in the indictment? 2. Did he so obtain it designedly and with intent to cheat and defraud them? 3. Were the several pretences laid in the indictment, or one or more of the material pretences false? and 4. Did the prisoner obtain the property *solely and entirely on the pretences, or one or more of them, which had been proved false?* As to the first of these questions, he observed that the prisoner undoubtedly obtained the goods as stated, and that there could be no doubt but that he obtained them with intent to cheat and defraud Cochran, Addoms & Co. As to the third point, he said he had already adverted to it; and as to the fourth point, *if some* of the pretences charged in the indictment were

false, and the goods were obtained *solely by means of those pretences,* and Messrs. Cochran, Addoms & Co. believed them to be true, the defendant was within the statute and guilty. The jury found a verdict of guilty. The counsel for the prisoner having excepted to the charge of the recorder, and to his decisions in receiving evidence of the admissions made by the prisoner subsequent to the ninth of November, tendered a bill of exceptions, which was duly signed, and a certificate of the recorder having been obtained that there was so much doubt in the case as to render it expedient to take the judgment of the supreme court thereon, the district attorney, pursuant to the provisions of the statute, 2 *R. S.* 736, sued out a *certiorari*, removing the indictment and bill of exceptions into that court: which court, after hearing the cause argued and holding the same under advisement, came to the conclusion that the defendant had been rightfully convicted, and directed the proceedings to be *remitted* to the *general sessions*, to the end that judgment might be rendered against the defendant. The sessions accordingly pronounced judgment, and sentenced the defendant to the state prison. The defendant then sued out a writ of error removing the record into this court, where the cause was argued by

*F. B. Cutting*, for the prisoner.

*S. Sherwood*, for the people.

The following points were submitted in behalf of the plaintiff in error, and argued by his counsel:

I. Improper testimony, calculated to prejudice the plaintiff in error, was admitted at the trial.

II. The charge of the recorder to the jury was erroneous.

1. He charged the jury that there was some evidence that a note of Haynes' had laid over; whereas there was no evidence whatever offered upon that point.

2. He erred in charging the jury that the third and fourth pretences laid in the indictment were proved to be false.

3. The indictment charges that Charles Addoms was induced by the false pretences therein set forth to deliver the

ALBANY,
Dec. 1835.

The People
v.
Haynes.

goods, &c. to Haynes, and that Haynes obtained the goods by means of the said false pretences, with intent to cheat, &c. The recorder charged the jury that the prisoner had undoubtedly obtained the goods as stated in the indictment, and that there could be no doubt he so obtained them, with intent to cheat, &c. This part of the charge is erroneous.

4. The recorder erred when he instructed the jury that if some of the pretences charged in the indictment were false, and the goods were obtained solely by those pretences, Cochran, Addoms & Co., believing them to be true, the defendant was within the statute, and guilty.

5. The recorder ought to have charged the jury that there had been no artifice or circumvention used, against which ordinary prudence might not have guarded, and that therefore the defendant ought to be acquitted. At all events, this point ought to have been distinctly submitted.

6. The recorder ought to have instructed the jury, that under the testimony, the goods were not purchased or obtained by means of any false pretences, and that there was no evidence to support the indictment.

7. He ought to have charged the jury, that the delivery of the goods on board the steamboat was in judgment of law a complete delivery, and that if it took place before the pretences laid in the indictment were made, that the prisoner ought to be acquitted.

8. He ought further to have instructed them, that if the pretences did in fact prevent Cochran, Addoms & Co. from claiming a re-delivery of the goods, yet, under the indictment, the defendant could not be convicted.

III. The pretences proved to have been false are not sufficient to support the indictment.

IV. The recorder ought to have charge the jury upon the law, as prayed for by the prisoner's counsel.

V. The jury erred in point of law, and being judges of the law, their errors may be corrected upon a bill of exceptions.

VOL. XIV.          70

After advisement, the following opinions were delivered :

By the CHANCELLOR.  We are called upon in this case to review a decision of the supreme court, upon a bill of exceptions taken on the trial of the plaintiff in error, upon an indictment for obtaining goods by false pretences.  No bill of exceptions can be taken in a criminal case, to authorize a superior court to correct an erroneous opinion of the court below, or the decision of a jury, upon matters of fact merely. The recent provision of the revised statutes only authorizes the defendant, on the trial of an indictment, to except to decisions of the court in the same cases, and in the manner provided by law in civil cases, 2 *R. S.* 736, § 21 ; and it is well settled, in civil cases, that the charge of the court or the decision of the jury upon matters of fact, cannot be reviewed on a bill of exceptions, where there has been no erroneous decision of the court upon matters of law.  The remedy of the party who is injured by a misdirection of the court, or an erroneous verdict of a jury, upon mere questions of fact, is by an application for a new trial, and not by writ of error.  *Graham* v. *Cammann*, 2 *Caines' R.* 168.  *Buller's N. C.* 316.  Mr. Justice Story, in delivering the opinion of the supreme court of the United States, in the case of *Carver* v. *Jackson*, 4 *Peters' R.* 80, says, the court to which a writ of error is brought has nothing to do with the charge of the court below upon mere matters of fact, or with its comments upon the weight of evidence.  Such observations are understood to be addressed to the jury, as the ultimate judges of matters of fact, merely for their consideration ; and are entitled to no more weight or importance than the jurors in the exercise of their own judgments choose to give them.  But if the court, in summing up the evidence to the jury, should misstate the law, it would furnish a proper ground for an exception to the charge of the court.  Even in that case, however, the exception should be strictly confined to such mistake in the law which was applicable to the case.  Whether it is competent for the court before which an indictment for felony is tried, to grant a new trial at the instance of the defendant, where there has been a palpable misdirection of the court upon mere matters of fact,

or a verdict clearly against the weight of evidence without any such misdirection, when no erroneous decision in point of law has been made, is a question which this court is not now called upon to decide. If the court before which the trial is had cannot grant a new trial in such a case, the remedy, if any, is with the legislature ; as it is a settled principle of law that no writ of error lies to an inferior court, to review its decision upon matters of fact. So much of the charge of the recorder, in the present case, as related to the sufficiency of the evidence to establish the falsity of the pretences charged in the indictment, must therefore be laid out of view by this court in its decision, as being merely the expression of an opinion upon questions of fact which were submitted to the jury for their consideration, and not an erroneous decision of the court, upon a question of law, for which a bill of exceptions would lie.

It is insisted, however, by the counsel for the plaintiff in error, that the charge was erroneous in point of law, because the jury were instructed that it was not necessary for the public prosecutor to establish the falsity of all the pretences charged in the indictment as false ; but that it was sufficient to authorize a conviction, if the jury were satisfied that some of the pretences were false, and that the accused obtained the goods solely and entirely on these pretences, which were proved to be false, with an intent to cheat and defraud the persons from whom the goods were thus obtained. On this point I agree with Mr. Justice Nelson, who delivered the opinion of the supreme court, that the charge in this respect was more favorable to the accused than a correct construction of the statute would warrant. It is not necessary, to constitute the offence of obtaining goods by false pretences, that the owner should have been induced to part with his property solely and entirely by pretences which were false ; but if the jury are satisfied that the pretences proved to have been false and fraudulent were a part of the moving causes which induced the owner to part with his property, and that the defendant would not have obtained the goods, if the false pretences had not been superadded to statements which may have been true, or to other circumstances having a partial influence up-

on the mind of the owner, they will be justified in finding the defendant guilty of the offence charged, within the letter as well as within the spirit of the statute on this subject. I am accordingly of opinion that, in the case now under conside-ration, although all the pretences stated in the indictment, as *those upon the strength of which the goods were obtained*, were charged to be false, if either of them was in fact false and was intended to deceive the owners of the goods, and thus to induce them to part with their property, and actual-ly produced that effect, the indictment was sustained. One false pretence was sufficient to constitute the crime, al-though other false pretences were also charged in the in-dictment. As a general rule, if an averment in an indict-ment is divisible in its nature, and any one part thereof is sufficient of itself to constitute the crime, the other parts of the averment need not be proved, unless they are descriptive and material to the identity of that which is essential to the charge contained in the indictment. Thus, in an indictment for treason, where several overt acts of the same treason are charged in one count of the indictment, it sufficient to sus-tain the count, if any one of them is proved. *Lowick's case*, 13 *Howell's State Trials*, 277. So in an indictment upon the statute, making it a capital felony for clerks, carri-ers, and others employed in the care or transportation of the mail, to steal or take out of a letter any bank post-bill, note, bill of exchange, &c., it was held sufficient to prove that the defendant was employed in one capacity, in the care of the mail, although the indictment charges that he was em-ployed in two ; and where the indictment charged that the letter which was purloined contained a bank post-bill and a bill of exchange, it was held sufficient if the proof showed it contained either. *Rex* v. *Ellins, Russ. & Ryan's C. C. R.* 188. *See also Rex* v. *Shaw*, 2 *W. Black. R.* 790. In the case of *The King* v. *Hunt*, 2 *Camb. R.* 584, which was an indictment for *composing and publishing* a libel, Lord Ellen-borough held it sufficient to prove the *publication*, although no evidence was adduced to show the *composing* of the libel by the defendant ; that if an indictment charged that the defendant did and caused to be done a particular act, it was enough to prove either. He also says, " this distinc-

tion runs through the whole criminal law, and it is invariably enough to prove so much of the indictment as shows that the defendant has committed a substantive crime therein specified." *See also the King* v. *Hollingberry*, 4 *Barn. & Cress. R.* 329, *and Hill's case, Russ. & Ryan's R.* 390.

Neither is it necessary, to constitute the statutory offence of which the plaintiff in error was convicted, that any false token should be used, or that the false pretences should be such that ordinary care and common prudence were not sufficient to guard against the deception. Such was undoubtedly the rule in relation to cheats which were punishable by indictment by the common law in England. On this subject our English ancestors originally adopted a laxer rule of morality than their Scottish neighbors, who very properly held the crime of swindling, or obtaining goods by wilful lying or other false pretences, as on a par in point of moral turpitude with stealing; and it was punished acordingly under the common law of Scotland. Thus in *Hall's case*, 1 *Hume's Crim. Law*, 173, the prisoner was convicted, and transported for seven years, for the crime of falsely assuming the character of a merchant, by hiring a shop and filling it with fictitious bales; by which pretence he induced several persons to furnish him with goods on a credit, when he had in fact no intention of carrying on business as a trader. In *Scott's case*, 1 *Alison's Crim. Law*, 365, the swindling for which the prisoner was convicted, and sentenced to 18 months imprisonment, was the obtaining of hay from a farmer, upon the false and fraudulent pretence that he was the contractor's clerk, taking up forage for the use of the cavalry. *Joanna Rickerby* was also convicted of swindling in obtaining wearing apparel, by assuming a false name and falsely pretending that she had lost her clothes by shipwreck. In *Reid's case, Burnet*, 173, the fraud consisted in falsely assuming the character of an excise officer, and thus obtaining money under the pretence of compounding for the forfeiture on goods that had been smuggled. In *Harvey's case*, 1 *Alison*, 364, the prisoner was convicted, and transported for seven years, for obtaining goods deposited with another by the owner for safe keeping, under the false pretence that he was employed by such owner to receive the goods so deposited; and

ALBANY,
Dec. 1835.

The People
v.
Haynes.

ALBANY,
Dec. 1835.

The People
v.
Haynes.

in *Kirby's case*, 1 *Hume*, 174, the prisoner was sentenced to be transported for five years, for obtaining a sum of money from a banker in Leith, under the false pretence that he had money in the hands of his banker in London, and accordingly drawing a draft on a banker there with whom he had no account, and when he had no reason to suppose the draft would be paid.

It was found in England, as early as the reign of George the 2d, that the rule of the English common law was not sufficiently rigid to protect the honest and unsuspicious—that class who stand most in need of protection—against the falsehoods and impositions of swindlers; and a statute was thereupon passed, to remedy the defect of the common law, which is the origin of our own statutory provisions, and of the subsequent English statutes on this subject. These statutes have adopted the principles of the Scottish common law, and the decisions under them, both in this state and in England, have been substantially the same as in the cases above referred to from Hume, Burnet, and Alison, who are the principal writers upon the criminal law of Scotland. Under these statutes, as in the law of Scotland, the offence consists in intentionally and fraudulently inducing the owner to part with his goods, or other things of value, either by a wilful falsehood or by the offender's assuming a character he does not sustain, or by representing himself to be in a situation which he knows he is not in. Thus in *Aivey's case*, under the English statute, the prisoner was convicted, and transported for seven years, for obtaining pay for the carriage of goods, upon the false pretence that he had delivered the goods and taken a receipt for the same, which he had lost or mislaid, 2 *East's R.* 30. So in *Witchell's case*, 2 *East's P. C.* 830, the obtaining of money upon a false account of the number of workmen employed in the business of a manufacturing establishment, by which the prisoner, who was entrusted to pay them, obtained a larger sum than was due to them for their wages, was held to be within the statute. In *Rex v. Jackson*, 3 *Campb. R.* 370, upon an indictment for obtaining goods under the false pretence of immediate payment, by giving in payment a check on a banker with whom the prisoner had no funds, and with whom

ALBANY,
Dec. 1835.

The People
v.
Haynes.

he kept no account, Bailey, J. said the same point had recently been before the twelve judges, and they were all of opinion that it was an offence indictable under this statute, to obtain goods by giving a check upon a banker with whom the party kept no cash, and which he knew would not be paid. In this state also, so far as questions have been brought before the higher tribunals, the statute has received a similar construction; and the decisions in the courts of oyer and terminer, so far as they have come under my notice, especially since the decision of the case of *The People* v. *Johnson*, in 1815, 12 *Johns. R.* 292, have been in conformity with the principles adopted by the English judges, in giving effect to their statutory provisions on this subject. *Lynch's case*, cited by the counsel for the plaintiff in error, from the City Hall Recorder, 1 *City Hall Rec.* 138, was incorrectly decided, as the offence in that case was clearly within the statute. The fact that checks are frequently drawn by men of business, before they have funds actually in bank to meet them, could not alter the law of the case; as it must always be a question for the consideration of the jury, whether the prisoner intended to commit a fraud by imposing a check upon another which he knew would not be paid when presented.

I am aware, from numerous cases which have come under my observation, judicially and otherwise, that the rule of morality established by the decisions under these statutes, and by the common law of Scotland, has been deemed too strict for those who, in 1825 and subsequently, have been engaged in defrauding widows and orphans, and the honest and unsuspecting part of the community, by inducing them to invest their little all, which in many instances was their only dependance for the wants and infirmities of age, in the purchase of certain stocks of incorporated companies, which the vendors fraudulently represented as sound and productive, although they at the time knew the institutions to be insolvent, and their stock perfectly worthless. But I am yet to learn that a law which punishes a man for obtaining the property of his unsuspecting neighbor by means of any wilful misrepresentation, or deliberate falsehood, with intent to defraud him of the same, is establishing a rule of morality which will be deemed

too rigid for the respectable merchants and other fair business men of the city of New-York, or of any other part of the state. Neither do I believe that any honest man will be in danger of becoming a tenant of the state prison, if the statute against obtaining money, or other things of value, by false and fraudulent pretences, is carried into full effect, according to the principles of the decisions to which I have referred. But it may indeed limit and restrain the fraudulent speculations and acts of some, whose principles of moral honesty are regulated solely by the denunciations of the penal code. The law upon this point, as laid down by the supreme court in this and numerous other cases, is unquestionably the settled law of the land, in conformity with both the spirit and the intent of a positive legislative enactment. But if those members of this court who are senators, believe that either the morals or the welfare of the community will be promoted by repealing this statutory provision for punishing the crime of swindling, which in point of moral turpitude is frequently more aggravated than some cases of simple stealing, it will be their duty, in their legislative capacities, to vote for a repeal of the law ; leaving the honest and the unsuspecting to protect themselves as they may against the arts and deceptions of those who intentionally defraud them of their property, by wilful and corrupt lying, and other false pretences, calculated to deceive that class of citizens which is most in need of the protection of the law. In this place, as members of the court of dernier resort, it is our duty to declare the law as it now exists ; so that the declared will of the legislature may be carried into full effect. In the case now under consideration, I have no doubt that the prisoner was properly convicted of the offence charged in this indictment, if the goods were obtained upon the representations which were proved to be false. It is evident, from the testimony, that at the time the representations were made, he was hopelessly insolvent to the amount of seventy thousand dollars ; that he knew his situation, and for the purpose of inducing the owners of the goods to let him have them on a credit, he represented himself as in easy and unembarrassed circumstances as to his money matters, able to pay all he owed ; and that he was worth

from nine to ten thousand dollars over and above all his debts. It only remains, therefore, to consider the question whether the delivery of the goods was obtained by means of these false and fraudulent pretences, or whether, in legal contemplation, the goods had been delivered before that time, although the prisoner was not then aware of the fact.

It appears from the testimony that the plaintiff in error had been in the habit of dealing with Cochran, Addoms & Co. previous to the time when these goods were obtained, and upon credits of about four months; that when he applied for these goods, they entertained no suspicion as to his credit; that the goods were selected, packed up in a box marked *Charles Haynes, Boston*, which was the place of his residence, and sent on board of the Providence steamboat, according to his direction, to be transported at his expense to the latter place, and taken from thence to his place of residence; and that a receipt was taken therefor from the master of the steamboat, stating that the box of goods was to be transported to Providence and delivered to the Boston waggoner, who receives goods at Providence and delivers them at Boston according to the marks and addresses on the packages; and one of the prosecutors, who was a witness, testified that after the box was delivered on board the steamboat, as directed by Haynes, he considered it as being at the risk of the latter if it was lost or stolen. After the box had thus been delivered on board the boat, but before Haynes was aware of that fact, the witness heard a report respecting the latter, which induced him to suspect his credit; and upon Haynes coming to the store, the witness, without informing him that the goods had already been sent to the steamboat, told him they could not deliver the goods in consequence of having heard that he had a note protested. Upon which occasion the false representations as to his situation and credit were made; and the witness being satisfied therewith, handed to him the receipt and invoice of the goods, and took his note for the same at thirty days. The counsel for the prisoner insisted, and asked the court so to instruct the jury, that delivery of the goods on board of the boat was a complete delivery, and that as the

pretences were made after such delivery, although they might have prevented Cochran, Addoms & Co. from obtaining a re-delivery of the same, that was not sufficient to sustain the charge as laid in the indictment. The court, however, charged the jury that the prisoner had undoubtedly obtained the goods from the prosecutors, as charged in the indictment; to which charge an exception was taken. If the decision of the court was wrong upon this question of law which arose in the case, the judgment of the court below should be reversed, on the ground that the plaintiff in error did not obtain the delivery of the goods by reason of his false pretences, although he intended to do so at the time the false representations were made.

The supreme court considered the delivery of the goods as incomplete and conditional, because the invoice had not been delivered, nor the security for the purchase money given, and because the receipt of the master of the boat was still in the hands of the vendors. I do not understand from the testimony, however, that there was any agreement or understanding between the parties, either express or implied, that the goods should be retained until the invoice should be delivered and a note given for the purchase money; and the receipt of the master of the boat was merely taken by the vendors as a voucher, to show that they had sent the goods on by the boat as directed. From the testimony, it also appears that the possession of the receipt was not necessary to enable the purchaser to obtain the goods upon their arrival at the place of destination. Even where goods are sold upon the understanding that they are to be paid for on delivery, if the goods are delivered without insisting upon payment at the time of delivery, the title passes absolutely to the purchaser, unless there is a special agreement or a usage of trade showing the delivery to be conditional. Delivery of goods also to a servant or agent of the purchaser, or to a carrier or master of a vessel, when they are to be transported by a carrier or by water, is equivalent to a delivery to the purchaser; and the property, with the correspondent risk, immediately vests in the purchaser, subject to the vendor's right of stoppage *in transitu,* if the purchaser becomes insolvent before the goods arrive at their place of desti-

nation ; and particularly when the carrier is specially named by the vendee. 2 *Kent's Comm.* 499. *Dawes* v. *Peck*, 8 *T. R.* 330. In the present case, therefore, I think we are bound to consider the delivery of the box on board of the boat, to be sent on to the vendee's residence at Boston, and delivered there according to the directions on the box itself, as a valid delivery of the goods, so as to divest the vendors of the possession as well as of the title ; leaving them the mere right of stoppage *in transitu*, in case of the purchaser's insolvency.

The right of the vendor to reclaim his goods, as a security for the unpaid purchase money, while in the hands of the middleman, was orginally derived from the court of chancery. It is a mere equitable authority to repossess himself of the goods, upon the insolvency of the vendee ; and it cannot be exercised at the mere caprice of the vendor, when no such insolvency exists. *Per Lord Stowell, in the case of The Constantia,* 6 *Rob. Adm. R.* 321. To invest the vendor with the right of property and possession of the goods after they have been absolutely delivered to the carrier or middleman, there must be an actual stoppage by a positive exertion of the right, by the vendor or his agent, either by taking corporeal possession of the goods, or by a notice to the carrier not to deliver them to the vendee, or by some equivalent act ; and until such right is actually exercised, the right of property and possession remains in the vendee, who may maintain an action of trover against any one withholding the goods from him. But the actual exercise of the right revests the title to the property in the vendor, and enables him thereafter to maintain trover against any one who subsequently to the exercise of this right, obtains possession of the goods and refuses to deliver them to him. *Litt* v. *Cowley*, 7 *Taunt. R.* 169. In the present case the right of possession and of property was actually vested in Haynes, by the delivery on board the steamboat at the time the false and fraudulent pretences were put forth by him ; and the vendors had not in fact re-invested themselves with the title to the property by stopping it *in transitu.* He did not, therefore, in legal contemplation, obtain the possession or delivery of the property by means of the

false pretences stated in the indictment; although he intended to do so, not being aware of the fact of the delivery of the goods on board the steamboat, at the time the false representations as to his situation and solvency were made. Although in point of moral turpitude there is no essential difference between obtaining the possession of the goods by wilful and deliberate falsehood in the first instance, and preventing the vendor from exercising a legal and equitable right by similar fraudulent and corrupt means, it would, I think, be going too far, in a prosecution for felony, to say the two cases are the same, and that the accused may be convicted of the latter offence, under an indictment charging him with obtaining the delivery of the goods by means of these false pretences.

I therefore, for this reason only, think the judgment of the court below was erroneous, and that it should be reversed.

By Senator TRACY. I think some of the exceptions to the charge of the recorder were well taken, and that the supreme court has erred in deciding otherwise.

The indictment was under the statute against obtaining property by false pretences with intent to defraud. The proof on the trial went entirely to show that the goods were obtained on a previously established credit, without any pretence or representation whatever, and at most, that after being so obtained the defendant succeeded in retaining the possession of them by means of false pretences. If this be the true character of the transaction, the defendant was convicted of an offence not prohibited by law, and for which he certainly was not indicted. Whether it be so or not, depends on the fact of the delivery of the goods. Addoms, the principal witness for the prosecution, testifies that Haynes had a very good credit with the house of which the witness was partner, that he (Haynes) selected the goods himself, that they were put aside from the rest of the goods, packed up in a box, which was marked on the outside and addressed to Charles Haynes, Boston, being the place of his residence; that the goods were afterwards sent to the Provieence steamboat, according to Haynes' directions, and a receipt taken by the cartman,

I can have no doubt that these facts constituted an abso-
lute delivery, and indeed it is admitted on all sides that it was
such a delivery as put the property wholly at the risk of the
vendee, and it might be added, such a delivery as would ena-
ble him to maintain trover or any other action for their loss
or injury.   But it is said that while the goods were in this
situation, and before they had reached their final destination
at Boston, the vendors had a right to resume the actual pos-
session of them.   This I very much doubt ; for the fact that
Haynes was on the spot, personally to select the goods, and
to have them laid aside, boxed and directed, seems to me to
be a perfect delivery, such as to deprive the vendee of any
specific lien on them. I take the rule to be, that though goods
are sold upon credit, yet if they are actually delivered to the
purchaser without any arrangement as to the security for the
payment of them, the vendor's lien upon them is gone.   3
*East*, 396.   5 *id*. 175.   4 *Esp. R.* 82.   The case is in this
respect distinguishable from  those in which the goods have
never reached the hands of the vendee, but have only passed
from the hands of the vendor to some intermediary person
as a carrier, &c. to be by him delivered to the vendee.  But
supposing the fact that Haynes' presence at the  purchase
and setting aside of the goods made no difference as to the
character of his possession, and that they were only in transi-
tion so that the vendor still had a lien on them, Haynes was
yet the legal owner of the goods.  So far as ownership is
concerned, the delivery to the master of the steam boat, or
even to the cartman, was sufficient, and any disposition
which Haynes saw fit to make of them would be valid, sub-
ject at most to the equitable lien of the vendor for the amount
due to him.   Delivery of goods to a servant or agent of the
purchaser, or to a carrier or master of a vessel, where they
are to be sent by a carrier or by water, is equivalent to de-
livery to the purchaser, and this though the carrier was to
be paid by the vendor. 2 *Campb.* 639.   3 *Bos & Pul.* 584.
6 *Cowen*, 114.   The right of *stoppage in transitu* has
not the effect which the supreme court seems to sup-
pose, of making the delivery conditional, but is only a
lien which the vendor, under certain circumstances, may
enforce to secure the price, and even if enforced, the

**ALBANY,**
Dec. 1835.

The People
v.
Haynes.

goods strictly belong to the vendee ; and if they shall prove of more value than the lien, though that be for the whole purchase money, the balance belongs to the vendee. It is erroneous to suppose that the right of stoppage continues the ownership in the vendor. " It is a contradiction in terms," says Justice Buller, " to say a man has a lien on his own goods, or has a right to stop his own goods *in transitu.*" The right of the vendor to stop goods *in transitu*, in case of the insolvency of the vendee, originated in the courts of equity, and was first heard of in *Wiseman* v. *Vandeput*, 2 *Vern.* 203 ; and though it has been greatly favored and encouraged by the courts of law, as well as those of equity, for the purpose of substantial justice, yet it has never been held to rest on the ground of a right to rescind the contract, *vide Hodgson* v. *Loy*, 7 *T. R.* 445 ; and therefore it is settled that a court of equity has no jurisdiction to support it by process of injunction, 2 *Kent's Comm.* 492.

But the supreme court thinks that although the property was undoubtedly for some purposes to be considered delivered, yet the delivery was " incomplete and conditional," so that the vendors had the right to resume the possession. If this were conceded, I do not see how it affects the present question, unless the offence charged was that of *preventing the vendors from resuming the possession* by means of false pretences, which it requires no argument to show would not sustain an indictment. But I find nothing in the case to show that the delivery was " incomplete and conditional ;" indeed I am not sure that I comprehend what is meant by an incomplete delivery, but presume it means, at most, no more than a conditional delivery ; and to constitute a conditional delivery, it is necessary the condition should be express. 4 *Mass. R.* 405. *Furniss* v. *Hone*, 8 *Wendell* 247. The circumstances from which the supreme court infer that the delivery was conditional, are, 1. The invoice had not been delivered ; 2. Security for the purchase money had not been given ; and 3. The receipt of the master of the boat was in the hands of the vendors. The first and last of these circumstances no way affect the fact or character of the delivery ; the invoice or bill of the goods was immaterial, and the receipt of the master of the

boat was necessarily given after the delivery, and of course any disposition made of it could not affect that fact. The objection that " security for the purchase money had not been given," assumes what no where appears, that security was to be given. The utmost security that could have been contemplated was the purchaser's note, and if this had been an express condition of the sale, of which there is no evidence, yet it was waived by a delivery without a concurrent and express demand. This principle was fully settled in *Chapman* v. *Lathrop*, 6 *Cowen*, 110, and in this court, *Lupin* v. *Marie*, 7 *Wendell*, 77. In every view, therefore, that I can take of this point, I am satisfied the exception that there was no evidence that the goods were *obtained* by means of the false pretences, was valid.

I am also satisfied that another exception was well taken ; it is that to the instruction to the jury, that if *some* of the pretences were false, and they (the jury) believed the goods were obtained solely by means of them, the indictment was sustained, notwithstanding *other* pretences alleged to be means of obtaining the goods and averred to be false, were not proved to be false. My impression, on the argument, was against this exception ; but on re-examining the opinion of the supreme court, their views on this point appear to me plainly erroneous. The offence of obtaining goods by false pretences is combined of two distinct elements, to wit, false pretences and obtaining the goods ; neither of them alone constitutes an offence. An indictment, therefore, must set forth the pretences by which the goods were obtained, and expressly aver them to be false ; and when so set forth and averred to be false, they, together with the obtaining of the goods, constitute the offence charged. It follows necessarily, that *every pretence* thus set forth and charged to be false, is made a substantive part or constituent element of the offence for which the indictment is found, and of course cannot be deemed immaterial, much less impertinent. The distinction between material and immaterial averments in an indictment is settled to be, that if the averment be connected with the charge, it must be proved ; but if it be wholly immaterial, or if the averment be totally unconnected with the charge, it need not be proved. 1 *Chit-*

*ty's Crim. Law*, 192. Here each and every pretence set forth and alleged to be false is not only intimately connected with the circumstances that constitute the crime, but is in fact a part and portion of the crime charged. It is therefore a much stronger case than those usually put, to distinguish a material from an immaterial or impertinent averment. The general rules and principles of pleading with respect to the structure of a declaration are applicable to an indictment, and if we look at the decisions as to averments in the former, which must be proved as laid, there would seem no room for doubting the necessity in the present case. The leading case, *Bristow* v. *Wright*, *Dougl.* 665, settled by a judge renowned for disregarding technical rules when they interfered with substantial justice, was of an averment by no comparison as material as that under consideration. The supreme court seems to regard the cases of *The King* v. *Berrott*, 2 *Maule & Selw.* 379, and *The People* v. *Stone*, 9 *Wendell*, 182, as authorities which support the recorder's charge on this point ; but I find nothing in them that can be properly viewed in this aspect ; certainly not in the first case, the whole reasoning of which is to show the necessity of making the charge specific, by a distinct averment of the falsity of those pretences or representations which are intended to be relied on as constituting the offence. Why it should be indispensable thus to designate them, if they or any of them, when so designated and averred, can be disregarded on the trial as " not intimately connected with the circumstances which constitute the crime," I am unable to perceive ; and in *Stone's case*, though there is an expression of the court seeming to confound the case of several pretences with that of several assignments of perjury in one count, yet Justice *Sutherland*, who delivered that opinion, in showing that it was necessary to negative only the pretences relied upon as material, says, " If it were necessary to negative all the false pretences in the indictment, it would be necessary to prove them all false on the trial ;" plainly indicating that notwithstanding his intimation of its being sufficient to prove one of several assignments in the same count, he perceived the necessity of making the proof, on an indictment for false pretences, co-extensive with the pretences spe-

ALBANY,
Dec. 1835.

The People
v.
Haynes.

cially averred to be false. The supposed analogy to an indictment for perjury does not hold. There several perjuries, each constituting a distinct offence, may be assigned in the same count, and proof of one is sufficient; which is indeed no more than to say, if several offences are charged in several counts, proof to support one count is sufficient; but here the several false pretences charged, constitute but one offence, and each is alleged by the indictment as an ingredient of it. To say that enough of them was proved to show that the jury did no injustice to the prisoner by convicting him, is no more satisfactory than the same argument might be if there had been no indictment whatever. The objection of the inconvenience and difficulty of proving every pretence to be false that the indictment alleges to be false, is entitled to no weight, even if such inconvenience and difficulty really exist; but they do not. The grand jury have no right to find that any other pretences were false than such as are proved to them to be so; and if they do not, there will be no more difficulty of proving their falsity on the trial than before them. And here is to be found a decisive test of the necessity of having the proof sustain all the averments of the indictment. Unless it does, the grand jury may indict for one offence, and the traverse jury convict for another. This actually has occurred in the present case. That the grand jury would have indicted for what the petit jury have convicted, or *vice versa*, is what may be surmised, but never can be known; consequently that great principle of security for personal liberty, which requires the concurrence of both in the same facts to produce a conviction, has not been observed.

I have another strong objection to the conviction, which is founded in the belief that the false declarations proved were not, under the circumstances in which they were made, false pretences within the meaning of the statute. They were direct answers to distinct interrogatories put to the defendant, and are, I think, distinguishable from those artfully contrived stories, against which only, in my opinion, the statute was designed to guard. To say, as in this case, that an untrue reply to an inquiry made of a person how much he is worth,

ALBANY,
Dec. 1835.

The People
v.
Haynes.

or whether he is embarrassed, is what the statute means by a false pretence, is to give to it a sweeping and mischievous construction—a construction which, if carried out to all the cases it would reach, no court could enforce, no community could tolerate. I admit with Lord Kenyon, 3 *T. R.* 102, that the offence created by the statute is described in terms extremely general, and that there is difficulty in drawing a distinct line between the cases to which it does and to which it does not apply. But this very admission of Lord Kenyon, made many years after the statute was in force, proves what till very lately has never been doubted—that a bare naked lie, unaccompanied with any artful contrivance, is not what the statute denominates a false pretence. If it were, Lord Kenyon's remarks would be altogether unfounded; for in that case there could be no difficulty in drawing the line—indeed there would be no line to draw. At common law no mere fraud, not amounting to a defined felony, was an indictable offence, unless it affected the public. Lord Mansfield observed, that "an offence, to be indictable, must be such an one as affects the public;" and he instanced the use of false weights and measures in the course of general dealing, fraud by means of false tokens, &c. But fraud by a false token, designed to cheat only the individual defrauded, was not indictable at common law; it must be a false token designed to affect the public generally— such as false weights and measures, counterfeit marks on goods, &c. To meet the insufficiency of the law in this respect, the statute 33 *Henry* 8 was passed, making fraud on individuals, by means of *privy tokens*, misdemeanors. Under this statute it was settled that, to constitute a token, it must be something real and visible—as a ring, a key, &c.; but as this statute did not reach cases of fraud effected by verbal misrepresentations, however ingenious in their contrivance and well fitted they might be to deceive the most wary, and a case of most flagitious fraud occurring, where the perpetrator went unwhipped of justice because there happened to be no token used, notwithstanding the means that were used were equally fitted to throw a cautious man off his guard, the statute of 30 *Geo.* 2, called commonly the statute against false pretences, was enacted. From

this statute the term *false pretences*, found in our statute, was taken; and the connection in which it is placed in our statute shows plainly that it was adopted there with a regard to the circumstances which, in the original English statute, attached to it a particular and technical meaning. Our statute, 2 *R. S.* 677, § 53, reads, "Every person who, with intent to cheat or defraud another, shall designedly, by color of any false token or writing, or by any other false pretence," &c. The inquiry here is whether "any *other* false pretence" means any false assertion, however bald and naked it may be—as in the present case, where the defendant, on being asked if he was any way embarrassed, replied he was not—or means such false pretence as would naturally have an effect on the mind of the person to whom he was addressed equivalent to that of a false token. The history of the adoption of the term, leaves me with no doubt that the latter is its statutory meaning. It indeed is not as clear as as it has been assumed to be, that the common lexicographical meaning of *pretence* is *assertion*. An authorized definition of it is, "a delusive appearance produced by false representations;" and this comes much nearer to my notion of its statutory meaning, than any definition does which confounds it with a naked falsehood.

It was many years after the act of 30 *George* 2, before the English courts made any considerable advance towards the construction that is now so much favored. *Young* v. *The King*, 3 *T. R.* 102, may in this respect be considered a pioneer case; and when the facts in it are compared with those of some modern cases, it will be seen how fast of late the new doctrine has been travelling. In that case four persons conspired to defraud another, by concertedly and falsely representing to him, that a large bet had been laid with a colonel in the army that a certain pedestrian would be performed, and that they or some of them had a shares in the bet, thereby inducing him to advance to one of them a sum of money, and become a share-holder in the wager. This, which in truth was indictable at common law as a conspiracy, was held to be within the statute, and the rule was then laid down, that when a party has obtained money or goods, by falsely representing himself to be in a situation in which he was not, or

by falsely representing any occurrence that had not happened, to which persons of ordinary caution might give credit, he was guilty of the offence. This rule the supreme court adopted, without argument or explanation, in the case of *The People* v. *Johnson*, 12 *Johns. R.* 292, and it has been gradually enlarging itself, down to the present case. The rule, as originally announced and applied, is not perhaps exceptionable, except for its vagueness and great liability to abuse. It meant, in the case where it was first applied, a false representation with circumstances fitted to deceive a person of common sagacity, exercising ordinary caution. It is now construed to mean any false declaration by which any person has been deceived. The construction adopted in this case is, I am persuaded, not only an incorrect, but a mischievous construction of the statute—a construction which, if strictly maintained, would overflow our courts with criminal prosecutions, and our jails and penitentiaries with convicts; the whole penal code, beside, would not be half so burthensome to execute, or half so fruitful of convictions; most of the common dealings of life might give birth to complaints before grand juries, and every exchange of property, from a ship's cargo, to a barrel of flour, and even less, might afford occasion for a public prosecution. The principle that has been advanced in the opinion we are reviewing is, that " where falsehood has had a material effect to induce a person to part with his property, the offence has been committed." Apply this rule not only to the great exchanges of property, but to the innumerable and comparatively insignificant dealings of men—to every swap of horses—in fine, to every transaction by which property is transferred, a note given, or money paid—and no man could count the cases it would reach. Merchants and others in the habit of giving credits, of incurring great risks for the chance of great profits, might at first be gratified with a rule that enabled them to enforce collections by the terrors of a criminal prosecution; but when even handed justice commends the poisoned chalice to their own lips, and they shall find themselves arrained at the bar of criminal justice for every misrepresentation of the cost, quality, saleableness or value of ev-

erty article they had sold, they too will be ready to exclaim " 'Tis rigor, and not law."

It can be said, I know, there will be no difficulty if men are honest and tell the truth. All will admit the obligations of truth and honesty; all have admitted them from the beginning of time; but how feeble have human laws proved in their efforts to enforce them. Does it follow, if men are not honest and will not tell the truth, that they are to be arraigned, and tried, and convicted as felons? What scheme of criminal jurisprudence could carry out this principle? What prisons could contain the convicts? We have it from the highest authority that by nature " all men are liars;" and a master judge of the human character has said that " to be honest, as the world goes, is to be one man picked out of ten thousand." To punish as a crime, then, what the multitude of offenders make a custom, is to attempt what we can never hope to execute. It is the remark of a profound philosopher, that " the operation of the wisest laws is imperfect and precarious; they seldom inspire virtue; they cannot always restrain vice; their power is insufficient to prohibit all that they condemn, nor can they always punish the actions which they prohibit." Though the laws will not justify, yet they must recognize the frailties and imperfections of human nature, and they do deal with men as beings, subject to propensities and passions which they may aid to restrain, but which it is impossible to extirpate. How inconsistent would it be, when the law will not receive a man's oath if he has sixpence at stake upon it, that it should send him to the state's prison for an untrue answer to an inquiry into his pecuniary affairs, which he may have the strongest motive for concealing. And how disturbed and uncomfortable would be the condition of a community like ours, where traffic and credit are infinitely ramified and unceasingly active, if every person dissatisfied with a bargain, or disappointed by a misplaced confidence in the responsibility or punctuality of another, shall be quickened, by the prospect of redress or revenge, to recollect some untrue representation made in the course of the transaction—stimulated by the hope of rescinding a bad bargain or of securing a doubtful debt, or irritated by the unexpected loss of what he had supposed a

good one—how natural it is that he should persuade himself that " falsehood had a material effect to induce him to part with his property ;" and prompted by an opinion which interest or irritation had created, first to threaten a criminal prosecution, and afterwards, if the terror of it proved unavailing, to sustain it by testimony always colored, and sometimes wholly composed by his passions. It is dangerous to give one man such power over the reputation and personal liberty of another. If possessed, it would be often abused ; and it is inevitable that perjuries would be multiplied, and injustice and rank oppression promoted.

I cannot concede or conceive that a construction is sound, or fitted to advance the general welfare, which proposes to protect property from loss by impositions which the owners can easily guard against, and exposes reputation and liberty to invasions which no prudence or integrity may always repel. Besides, it is an eutopian idea, that the sanctions of criminal justice can be made co-extensive with moral delinquencies. However agreeable to our sentiments of natural justice it might be to punish every immoral act, it would be quixotic to attempt it. No community ever assumed the obligation of protecting, by penal laws, every member of it from the consequences of his own credulity, imprudence or folly ; and if any one should, it would be but following " false images of good," that could make no promise perfect. It is impossible for the public to sustain the burthen of redressing every injury or loss which individual credulity or cupidity may bring upon itself. The most it can do, and what by the statute under consideration it proposes to do, is to protect individuals from those ingeniously contrived frauds and unusual artifices against which common sagacity and an ordinary experience of mankind will not afford a sufficient guard. Beyond this men must trust to their own prudence and caution, with such aids and redress as may be obtained from the civil tribunals.

For all and each of the objections I have stated, I am for reversing the judgment of the supreme court.

Opinions were also delivered by *Senators* EDMONDS, EDWARDS and MAISON, concurring with the CHANCELLOR and

*Senator* TRACY in their conclusions that the delivery of the goods on board the steamboat was an absolute delivery, and invested the purchaser with both the title and possession; and that consequently, under no possible view of the case, could the prisoner be considered as having *obtained* the goods by *false pretences.*

On the suggestion of the Chancellor, the court agreed in the first instance to pass only upon the question whether the delivery of the goods on board the steamboat, under the circumstances of the case, was an absolute delivery, and invested the purchaser with the title as well as the possession of the goods; and on the question being put, the members of the court *unanimously* expressed the opinion that the delivery was absolute. Whereupon the judgment of the supreme court was *reversed.*

Judgment reversed.*

* See note at the commencement of this case.